UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVUS OPTIMUM LABS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GINA TAMAYO, et al., <br><br> Defendants. | Case No. 13-cv-01119-JST <br><br> **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND DENYING APPLICATION FOR WRIT OF ATTACHMENT** <br><br> Re: Dkt. No. 17, 18 |

Before the Court is Plaintiffs Novus Optimum Labs, dba Novus Optimum, Inc. and Meliza Reyes' Motion for Preliminary Injunction and Application for a Writ of Attachment against Defendants Gina and Edgardo Tamayo and Novus Opti-Lab.

**I. BACKGROUND**

Plaintiff Novus Optimum Labs, dba Novus Optimum, Inc. is wholly owned by Plaintiff Meliza Reyes. Compl., ECF No. 1 ¶ 5. Reyes, 67, filed this action on March 12, 2013, alleging that one of her employees, Defendant Gina Tamayo, absconded with $160,000 in cash and almost $100,000 in Reyes' personal property after Reyes entrusted her with the keys to the corporate facility on Pier 26 in San Francisco. Id. ¶¶ 5, 20, 30. On March 16, 2013, Plaintiffs filed an *ex parte* request for prejudgment attachment. ECF No. 16. This court denied that application on April 4, 2013, ECF No. 13. Defendants answered the Complaint and counterclaimed on April 30, 2013. ECF No. 15. Plaintiffs filed the instant motion for preliminary injunction on May 13, 2013, ECF No. 17, and application for writ of attachment on May 14, 2013, ECF No. 18. The Verified First Amended Complaint was filed May 23, 2013. ECF No. 20 ("FAC"). This court held a hearing on Plaintiff's Motion and Application for prejudgment attachment on June 20, 2013.

**A. Plaintiffs' Factual Allegations**

Plaintiffs Reyes and Novus Optimum have been selling herbal supplement products since 1997 or 1998. FAC ¶ 10; Reyes Decl., ECF No. 18-2, ¶¶ 4–5. Those products include supplements such as "Brain Sharpener 4-Kids," "Age-Spots Cleanser," "Sleep Ezzy," "4-Cellulite," and "4-Glowing Complexion." FAC ¶¶ 11, 36a; Reyes Decl., ¶ 6. In 2008, Reyes met Defendant Gina Tamayo. FAC ¶ 13; Reyes Decl. ¶ 8. Reyes hired Ms. Tamayo to help with clerical duties, such as answering telephones, inventory control, labeling products, and filing. FAC ¶ 13; Reyes Decl. ¶ 8. Ms. Tamayo's husband, Edgardo, is also a named Defendant in this case.

In October 2010, while Reyes was traveling, Gina Tamayo accused Reyes' brother Celso Reyes, also employed by Novus Optimum, of sexually harassing her. FAC ¶ 16. Gina Tamayo subsequently obtained a restraining order from San Mateo Superior Court against Celso Reyes. Id. According to Plaintiff Reyes, she fired her brother Celso based on Tamayo's allegations. Id. ¶ 17; Reyes Decl. ¶ 11.

In September 2012, Reyes moved Novus Optimum from Pier 19 to Pier 26. Reyes Decl. ¶ 13. Plaintiff Reyes alleges that, before and after the move, she stored a substantial amount of valuable property at her Pier 26 corporate facility, including: two duck figurines valued at $4,000; a Fabergé egg purchased for $8,000; two "150 Years of Baseball" books signed by several players, including Mickey Mantle and Joe DiMaggio, valued at $30,000; four Lalique vases valued at $25,000; a Rodin sculpture appraised by Sotheby's in 1995 for $25,000; and $160,000 in cash. FAC ¶ 30; Reyes Decl. ¶ 16. Reyes alleges that the Tamayos both knew she kept expensive property in the facility, and that Gina Tamayo had a key to the Pier 26 facility, from which she made a copy for her husband. FAC ¶ 21–29; Reyes Decl. ¶ 14. Reyes alleges that over the course of January and February 2013, the Tamayos stole several of the items, including the cash. FAC ¶¶ 32–35. In addition, Reyes alleges that the Tamayos attempted to poison her, and that Gina Tamayo recorded her telephone calls. Id. ¶¶ 23, 38–39.

In addition to the alleged theft, Reyes alleges that the Tamayos stole the secret "Formula

5" for an unspecified Novus Optimum product, FAC ¶ 32, and that the Tamayos opened a sham business for the purpose of diverting revenue from Novus Optimum Labs' customers to the Tamayos' new business venture, called "Novus Opti-Lab," id. ¶¶ 27–29, 35–36; Reyes Decl. ¶ 23, 25–27. The FAC alleges that the Tamayos collected payment for Novus Optimum Labs products through their website, which is an unauthorized copy of the Novus Optimum Labs website, and then never shipped the purchased products. Id.

Plaintiffs assert claims for violation of the Lanham Act and for copyright infringement arising out of the Novus Opti-Lab business, as well as several state and common law claims arising out of the theft and embezzlement, including conversion, theft by larceny, fraud, negligent misrepresentation, and breach of implied contract. In addition, Plaintiffs sue under California's Financial Abuse of Elders law, Cal. Welf. & Inst. Code § 15610.30.

### B. Defendants' Factual Allegations

Defendants counterclaim for damages for fraudulent misrepresentation, breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment "due to the false promises and fraudulent misrepresentations Counterdefendants made to Ms. Tamayo in order to induce her not to bring legal action against them for repeated sexual harassment she suffered while employed by Counterdefendants at the hands of Counterdefendant Reyes' brother, Celso Reyes." ECF No. 15 ("Answer"). Defendants allege that, between February 2010 and October 2010, Ms. Tamayo was repeatedly sexually harassed by Celso Reyes. Id. p. 26. "Such instances of sexual harassment included, but were not limited to, groping and other offensive touching of Ms. Tamayo, repeated lude[sic] and suggestive comments to Ms. Tamayo, as well as Mr. Reyes actually exposing his genitalia in the workplace." Id. Ms. Tamayo sought and obtained a restraining order from the San Mateo County Superior Court in October 2010. Id. p. 27; G. Tamayo Decl., ECF No. 23, Ex. A ("Restraining Order").

According to the Tamayos, Plaintiff Meliza Reyes tried to dissuade them from taking legal action against her, as Ms. Tamayo's employer, stemming from the alleged harassment. First, Ms. Tamayo alleges that Plaintiff Reyes promised her "a substantial wage increase as well as health

1   and dental benefits" in or about December 2010. Id. p. 28; G. Tamayo Decl. ¶ 13. For six

2   months, Reyes failed to provide Ms. Tamayo with the increased compensation and benefits.

3   Answer p. 29. In August or September 2011, Reyes promised Tamayo instead that she would

4   receive ten percent of the proceeds of the sale of the Novus Optimum business; Reyes told Ms.

5   Tamayo that the business was worth between $100 and $500 million. Id.; G. Tamayo Decl. ¶ 13.

6       Ms. Tamayo alleges that in October 2010 she asked Reyes for help setting up a small

7   business selling complexion-lightening products. Answer p. 29. According to the Tamayos,

8   Reyes agreed to help, and suggested that the products be sold under a name similar to Novus

9   Optimum's so Ms. Tamayo could sell alongside Novus Optimum at trade shows and conferences.

10  Id. pp. 29–30; G. Tamayo Decl. 20. Defendants further allege that Ms. Reyes offered to help Ms.

11  Tamayo by allowing her to sell Novus Optimum products, too. Per Defendants, "Reyes supplied

12  the products required to fill those orders, and Ms. Tamayo was required to pay approximately 80%

13  of the proceeds to counterdefendant Reyes as the supplier." Answer p. 27; G. Tamayo Decl. ¶ 20.

14  Defendants allege that, pursuant to that agreement, Ms. Reyes authorized them to register the

15  fictitious business name "Novus Opti-Lab" in August 2011. Answer p. 27; G. Tamayo Decl. ¶ 21.

16  Reyes allegedly also promised to help Ms. Tamayo set up a website for Novus Opti-Lab, which

17  website is a subject of Ms. Reyes' Complaint. Answer p. 27; G. Tamayo Decl. ¶ 22.

18  **II.  JURISDICTION**

19      This court has subject matter jurisdiction over Plaintiffs' claims pursuant to federal

20  question jurisdiction, as their claims arise under the Lanham Act and the Copyright Act, under 28

21  U.S.C. § 1331, and supplemental jurisdiction, pursuant to 28 U.S.C. § 1367.

22  **III. MOTION FOR PRELIMINARY INJUNCTION**

23      Plaintiffs seek a preliminary injunction against Defendants enjoining them: (1) from using

24  the Novus Opti-Lab domain name, credit card terminal, and fictitious business name, and from

25  using either Novus Opti-Lab's or Novus Optimum's product marks; (2) from distributing, selling,

26  or offering for sale products bearing Novus Optimum or Novus Opti-Lab marks; (3) "[d]oing any

27  other act which is likely to confuse, mislead or deceive Plaintiffs' customers or members of the

28

public with whom Defendants are associated, sponsored by or approved by Plaintiffs"; (4) using, disclosing, copying, or transmitting any of Plaintiffs' trade secrets; (8) destroying, discarding, altering, or otherwise making unavailable to Plaintiffs any documentary, computer, or other evidence relevant to this action; (9) using, disclosing, copying, or transmitting the personal information of Plaintiffs' customers, and (10) coming within 100 yards of the Pier 26 facility.  PI Mot., ECF No. 17, p. 5.  For the reasons discussed below, the Court will grant the Motion.

### A.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  It is a device for "preserving the status quo and preventing the irreparable loss of rights before judgment." Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984).  An injunction is appropriate only where the remedies available at law are inadequate to prevent irreparable injury. Weinberger v. Romero–Barcelo, 456 US 305, 312 (1982).

Any party seeking a preliminary injunction must establish "(1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest." Earth Island Inst. v. Carlton, 626 F.3d 462, 469 (9th Cir. 2010) (citing Winter, 555 U.S. at 24).  The movant must carry the burden of persuasion "by a clear showing" for a preliminary injunction to issue. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

To grant preliminary injunctive relief, a court must find that "a certain threshold showing is made on each factor." Leiva-Perez v. Holder, 640 F.3d 962, 966 (9th Cir. 2011).  Provided that showing is made, in balancing the four factors, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011) (quotation omitted).

Preliminary injunctions may be granted based on written affidavits and inadmissible

5

evidence. See Flynt Distrib. Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984) (citing Ross-Whitney Corp. v. Smith Kline & French Laboratories, 207 F.2d 190, 198 (9th Cir.1953)) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.").

Finally, Federal Rule of Civil Procedure 65(d) authorizes federal courts to issue preliminary injunctions "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

### B. Likely Success on the Merits

As discussed more fully below, Plaintiffs have made a clear showing that they are likely to succeed on the merits of their Lanham Act, unfair competition, and copyright infringement claims, under their first five causes of action. Because those claims are sufficient to support the preliminary injunction Plaintiffs seek, the Court will not address the merits of Plaintiffs' remaining sixteen causes of action.

#### i. Trademark, Unfair Competition, and False Designation of Origin

To establish a claim for trademark infringement, Plaintiffs must prove that (1) they own valid trademarks, (2) Defendants used those marks without consent, (3) and Defendants' use of the marks is likely to cause confusion in the marketplace. 15 U.S.C. § 1114(a)(1). Plaintiffs' related claims for false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), and for unfair competition, may be proven via the same elements. Int'l Order of Job's Daughters v. Lindeburg & Co., 633 F.2d 912, 917 (9th Cir. 1980). Common law unfair competition and the federal prohibitions on trademark infringement and false designation of origin each "preclude the use of another's trademark in a manner likely to confuse the public about the origin of goods." Id.

Plaintiffs have established the ownership of a valid trademark. Although the names and packaging of Plaintiffs' products, and Plaintiffs' trade name, "Novus Optimum," are not registered

1    trademarks, they are protected pursuant to 15 U.S.C. § 1125(a), which extends the protection of

2    the Lanham Act to all valid marks acquired through use. See Two Pesos, Inc. v. Taco Cabana,

3    Inc., 505 U.S. 763, 768 (1992). Defendants do not contest the validity of the marks, or Plaintiffs'

4    ownership of them.

5            Defendants also admit that they used the mark: they started the Novus Opti-Lab business,

6    sold Plaintiffs' products, accepted payment from Plaintiffs' customers, used Plaintiffs' marks, and

7    maintained the Novus Opti-Lab website, which was, in substance, identical to the Novus Optimum

8    website. Plaintiffs' evidence also establishes that Novus Opti-Lab billed Novus Optimum

9    customers for Novus Optimum products. Plaintiffs have shown that Defendants have used the

10   marks, and that such use is likely to cause confusion in the marketplace, since Defendants have

11   sold Plaintiffs' products as originally packaged by Novus Optimum, thereby misrepresenting the

12   origin of the products.

13           Defendants address only the requirement that the marks be used without consent, arguing

14   that Meliza Reyes consented to the use of the Novus Optimum marks, customer list, and inventory

15   as part of her efforts to dissuade Gina Tamayo from taking legal action against Novus Optimum

16   based on Carlos Reyes' harassing conduct. That claim is supported only by declarations from the

17   Tamayos. There is no written evidence to corroborate Reyes' consent, and no evidence that would

18   corroborate the parties' alleged business relationship. Of particular significance, there is no

19   evidence that Defendants ever remitted any proceeds back to Novus Optimum, as they were

20   obligated to do pursuant to this alleged agreement.

21           By contrast, Plaintiffs submit a summary of revenue paid to Novus Opti-Lab (which was

22   prepared by Plaintiffs); a series of invoices for product sales to various customers that list as the

23   invoicing entity "Novus Optimum Lab," though the summary of revenue claims those customers

24   had paid Novus Opti-Lab; exemplar credit card statements for one of Plaintiffs' customers,

25   showing Novus Opti-Lab as payee for various purchases; and copies of the Novus Optimum and

26   Novus Opti-Lab websites, showing that they are substantially identical. Reyes Decl., ECF No. 18-

27   2, Exs. A–E. Plaintiffs also submitted the declaration of customer Kathy McElwaney, who states

28

that, for certain purchases, she believed she was paying Novus Optimum when, in reality, she had been paying Novus Opti-Lab, McElwaney Decl. to PI Mot. Finally, Plaintiff Reyes' declaration states that Novus Opti-Lab collected payment from Novus Optimum customers for Novus Optimum products, but never delivered them, prompting Plaintiffs' customers to call and complain. In the aggregate, the evidence establishes that Defendants used Plaintiffs' mark without consent.

Plaintiffs have also shown that Defendants' use is likely to cause confusion in the marketplace. Indeed, it already has, since at least some of Defendants' customers apparently thought they were purchasing products from the Plaintiffs. This is not surprising, since Defendants' domain name is almost identical to Plaintiffs', and Defendants have appropriated much of Plaintiffs' visual presentation without modification.

The Court finds that Defendants' declarations are insufficient to overcome Plaintiffs' "clear showing" that Defendants have infringed Plaintiffs' trademarks and copyrights. Plaintiffs have clearly shown that they are likely to succeed on the merits of their trademark, unfair competition, and false origin of goods claims.

### ii. Cybersquatting

"[C]ybersquatting occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 680 (9th Cir. 2005) (quoting DaimlerChrysler v. The Net, Inc., 388 F.3d 672, 689 (6th Cir. 2004)); see also 15 U.S.C. § 1125(d) (setting forth elements of cybersquatting claim).

To prove a violation of the Anti-Cybersquatting Consumer Protection Act (ACPA), a plaintiff must show that (1) the plaintiff owns a valid trademark that was distinctive or famous at the time the domain name was registered, (2) defendants registered, trafficked in, or used a domain name that is identical or confusingly similar to the plaintiff's mark, and (3) defendants had a bad faith intent to profit from the plaintiff's mark. 15 U.S.C. § 1125(d)(1)(A); Bosley, 403 F.3d at

681.

Plaintiffs have established these elements. The Court finds that Plaintiffs own a valid trademark, and that the trademark is distinctive. "Marks are often classified in categories of generally increasing distinctiveness . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful . . . . The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). Plaintiffs' "Novus Optimum" and "Novus Optimum Lab" marks, which do not describe, connote, or refer to the products Plaintiffs sell, is either arbitrary or fanciful. Thus, they are distinctive.

Secondly, for the reasons discussed above, Plaintiffs have clearly shown that Defendants published a website at a domain name that is confusingly similar to Plaintiffs' marks. Indeed, through the McElwany declaration and Plaintiff Reyes' declaration, Plaintiffs have established actual confusion based on: the confusingly similar domain name at issue, "novusopti-lab.webs.com," which is almost identical to the name "Novus Optimum" and confusingly similar to Plaintiffs' web domain, "novusoptimum.com"; the nearly identical website that Defendants published to that domain name; and Defendants' successful use of the website to sell Plaintiffs' products.

Defendants' bad faith is established by an examination of the factors set forth at 15 U.S.C. § 1125(d)(1)(B)(i), several of which apply here. The applicable factors include:

- Defendants' lack of trademark or other intellectual property rights in the "Novus Optimum" domain name, 15 U.S.C. § 1125(d)(1)(B)(i)(I);

- The fact that "Novus Optimum" does not consist of the legal name of any Defendant, or a name that is otherwise commonly used to identify any Defendant, 15 U.S.C. § 1125(d)(1)(B)(i)(II);

- Defendants' lack of prior use of the "Novus Optimum" domain name in connection with the bona fide offering of any goods or services, 15 U.S.C. § 1125(d)(1)(B)(i)(III);

- The lack of noncommercial or fair use of Plaintiffs' mark by Defendants, 15 U.S.C. § 1125(d)(1)(B)(i)(IV); and

9

- The Defendants' intent, as established by the evidence of their financial gain and consumers' actual confusion, to divert consumers from the Plaintiffs' online location in a manner that could harm the goodwill represented by the Plaintiffs' mark for the purpose of commercial gain, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the Defendants' site, 15 U.S.C. § 1125(d)(1)(B)(i)(V).

Consequently, Plaintiffs have clearly shown a likelihood of success on the merits of their cybersquatting claim.

### iii. Copyright Infringement

To succeed on their copyright infringement claim, Plaintiffs "must show ownership of the allegedly infringed material and . . . demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001). See also Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1159 (9th Cir. 2007). Plaintiffs must also show preregistration or registration of the copyright prior to the institution of this action. 17 U.S.C. § 411(a).

Here, Plaintiffs base their copyright claim on Defendants' copying of their website. They allege that they began the registration process for the website prior to filing of this action, that they are the owners of the website, that Defendants saw the website, and that they copied it. Defendants do not contest these facts, and, as stated above, they only argue that they copied the website with Plaintiff Reyes' consent. For the reasons discussed above, the Court finds Defendants' consent claims unpersuasive. Plaintiffs have clearly shown that they are likely to succeed on their copyright infringement claim.

### C. Likely Irreparable Harm

The mere possibility of irreparable injury is insufficient for a preliminary injunction to issue. Winter, 555 U.S. at 22. Moreover, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . ." City of Los Angeles v. Lyons, 461 US 95, 102 (1983). Finally, the harm must be beyond the ability of the law to redress absent injunctive relief; monetary harm alone does not constitute irreparable harm. Los Angeles Memorial Coliseum Comm'n v. NFL, 634 F2d 1197, 1202 (9th Cir. 1980).

The Copyright Act provides that federal courts "may, subject to the provisions of section

1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502.  Similarly, the Lanham Act authorizes federal courts to issue injunctions to prevent trademark infringement "according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). However, the historical presumption in copyright cases that a showing of likely success on the merits categorically satisfies the irreparable harm requirement was rejected by the Supreme Court in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006).  See also Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 979 (9th Cir. 2011) cert. denied, 132 S. Ct. 1713 (2012).  Regardless of the nature of the action, the moving party's burden always remains the same: it must make a clear showing of likely irreparable harm.

Courts have repeatedly recognized that "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) (citing Regents of Univ. of Cal. v. American Broadcasting Cos., 747 F.2d 511, 519–20 (9th Cir. 1984)).  Plaintiffs have presented evidence that their customers have complained because Defendants have accepted payment for Novus Optimum goods but have failed to deliver them, and because, when they have delivered them, customers were concerned about the appearance of the "Novus Opti-Lab" name on their credit card statements.  Moreover, Plaintiffs have clearly shown, and Defendants do not dispute, that Defendants have sold Plaintiffs' products under the Novus Optimum trade name and Plaintiffs' marks.

Defendants argue that Plaintiffs cannot show irreparable harm because Defendants have closed the Novus Opti-Labs website and have ceased selling Novus Optimum products.  The Court disagrees.  Though Defendants may have discontinued the conduct complained of in this case, nothing would prevent them from infringing Plaintiffs' trademarks and copyright in the future.  The Court finds a substantial likelihood of imminent and tangible harm resulting from Defendants' likely infringement of Plaintiffs' trademarks and copyright.

/ / /

### D. Balance of Equities

In considering the balance of equities, a court considering a preliminary injunction must assess "the degree of harm that will be suffered by the plaintiff *or* the defendant if the injunction is improperly granted or denied." Scotts Co. v. United Industries Corp., 315 F3d 264, 284 (4th Cir. 2002) (emphasis in original).

The hardship of improperly granting an injunction in this case is minimal, given Defendants' claim that they no longer sell Novus Optimum products, maintain the Novus Opti-Lab website, or have any desire to continue selling the products. By contrast, the hardship of improperly denying Plaintiffs' request for a preliminary injunction would be the likely and imminent irreparable harm discussed above, if Defendants re-engage in infringing commerce. The Court finds that the balance of equities therefore tips sharply in favor of Defendants.

### E. Public Interest

Enjoining violation of federal statutes is in the public interest. Am. Trucking Associations, Inc. v. City of Los Angeles, 559 F.3d 1046, 1060 (9th Cir. 2009). The only concern in enjoining allegedly infringing commerce here is the potential for improperly preventing consumers from purchasing products from Defendants, but Defendants disclaim any interest in continuing to sell Novus Optimum products. This factor therefore also weighs in favor of granting Plaintiffs' request for a preliminary injunction.

### F. Bond Requirement

Plaintiffs have made a clear showing under each of the four factors enumerated above, and are entitled to a preliminary injunction preventing the continued infringement of their trademarks and copyright. At oral argument, Plaintiffs consented to the imposition of a bond requirement of $10,000. Given the evidence of Defendants' sales to date and their claim that they were obligated to pay over eighty percent of their revenues to Plaintiffs, this amount is adequate to pay the costs and damages Defendants will sustain if the Court later finds that they were wrongfully enjoined or restrained. See Iconix, Inc. v. Tokuda, 457 F. Supp. 2d 969, 1003 (N.D. Cal. 2006) (requiring $10,000 bond where Defendant claimed it had discontinued infringing conduct); Fed. R. Civ.

1 Proc. 65(d), and the Court will order Plaintiffs to post a bond in that amount.

2 The Court's Order preliminarily enjoining Defendants is set forth in detail in the
3 conclusion.

## IV. APPLICATION FOR WRIT OF ATTACHMENT

Plaintiffs also seek a writ of attachment on Defendants' bank accounts, real property, and other non-exempt property to recover $160,000 in allegedly stolen cash, $14,683.40 in allegedly diverted payments from Novus Optimum to Novus Opti-Lab, and $98,900 in allegedly stolen personal property, for a total of $273,583.40. App. Attachment, ECF No. 18. For the reasons discussed below, the Court will deny the application.

### A. Legal Standard

Rule 64 authorizes federal courts to employ state law prejudgment seizure remedies. Attachment "is a remedy by which a plaintiff with a contractual claim to money (not a claim to a specific item of property) may have various items of a defendant's property seized before judgment and held by a levying officer for execution after judgment." Waffer Int'l Corp. v. Khorsandi, 69 Cal. App. 4th 1261, 1271 (Cal. 1999) (emphasis omitted). Attachment is therefore nothing more than "a provisional remedy to aid in the collection of a money demand." Kemp Bros. Constr. Inc. v. Titan Elec. Corp., 146 Cal. App. 4th 1474, 1476 (Cal. 2007). It is a "harsh remedy," requests for which will be "strictly construed." Blastrac, N.A. v. Concrete Solutions & Supply, 678 F. Supp. 2d 1001, 1004–05 (C.D. Cal. 2010).

In California, "an attachment may be issued only in an action on a claim or claims for money, each of which is based upon a contract, express or implied, where the total amount of the claim or claims is a fixed or readily ascertainable amount not less than five hundred dollars ($500) exclusive of costs, interest, and attorney's fees." Cal. Code Civ. P. § 483.010. Any party seeking prejudgment attachment must demonstrate that: (1) the claim upon which the attachment is based is one upon which an attachment may be issued; (2) the plaintiff has established the probable validity of the claim upon which the attachment is based; (3) the attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based; and (4) the

13

amount to be secured by the attachment is greater than zero. Cal. Code Civ. Proc. § 484.090(a). The probable validity requirement is satisfied "where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." Cal. Code Civ. Proc. § 481.190. Here, only the first two requirements are at issue.

Plaintiffs mix their causes of action in discussing their application for a writ of attachment. Plaintiffs' trademark and copyright infringement claims concerning the Novus Opti-Lab website and Defendants' sale of Novus Optimum products are unrelated to the alleged theft of $160,000 in cash and almost $100,000 in personal property. Facts relating to the former cannot support prejudgment attachment for recovery of the latter. Thus, the Court must examine Plaintiffs' case for a writ of attachment by examining separately Plaintiffs' evidence concerning the alleged thefts and Defendants' alleged misappropriation of roughly $15,000 in Novus Optimum customer purchases.

### B. Claims Upon Which Attachments May Be Issued

Writs of attachment are not available for tort damages. Plaintiffs argue that their claims nevertheless qualify for prejudgment attachment pursuant to an implied contract theory arising out of the misappropriation, or conversion, of Plaintiff Reyes' personal property. See, e.g., Arcturus Mfg. Corp. v. Rork, 198 Cal. App. 2d 208, 211 (1961). Plaintiffs argue that their claims are *ex contractu*, and that they may therefor choose to sue in assumpsit rather than in tort, thereby entitling them to prejudgment attachment. Attach. Mot., p. 9 (citing id.; Hill v. Super Ct., 16 Cal. 2d 527 (Cal. 1940); Oil Well Core Drilling Co. v. Barnhart, 20 Cal. App. 2d 677 (Cal. Ct. App. 1818)).

Plaintiffs' reliance on assumpsit as a theory of relief is unsupported by these facts. The assumpsit cause of action, which Plaintiffs do not even attempt to define, has been summarized by one treatise as follows:

> "(V)iolation by a bailee of his duty to exercise appropriate care for the preservation and safety of property entrusted to him may be regarded either as a tort or as a breach of an implied condition of his contract. Of course, where the bailee's acts amount to a conversion, the plaintiff may waive the tort and sue for the value of the

14

> converted property on the basis of goods sold and delivered, in which case his action is on a contract implied by law arising upon a waiver of tort.
>
> "The rule allowing the plaintiff to waive a tort and sue in assumpsit applies to cases involving conversion of personal property. The right of the owner to waive the tort and sue in assumpsit is not limited, as in some jurisdictions, to those cases where the wrongdoer has sold the property or otherwise converted it into money and recovery of the proceeds is sought. The owner may sue for the value of the property converted by proceeding in assumpsit as for goods sold and delivered. The basis of recovery is that he consents to the taking of his property and affirms the act of the wrongdoer. He treats it as a sale, and may recover the value due him as under a contract of sale." (7 Cal. Jur. 3d Supp., Assumpsit, ss 11-12, pp. 21-22, fns. omitted.)

H. Russell Taylor's Fire Prevention Serv., Inc. v. Coca Cola Bottling Corp., 99 Cal. App. 3d 711, 720 (1979).

This doctrine does not apply here. Plaintiffs do not allege that Defendants were Plaintiffs' bailees or that Defendants otherwise acquired Plaintiffs' property with Plaintiffs' consent; to the contrary, they allege that Defendants came into Plaintiffs' products and other items *without* Plaintiffs' consent. Also, Plaintiffs have not waived their tort claims to sue in assumpsit; they are pursuing their tort claims. These facts distinguish the present case from each of the cases cited by the Plaintiffs, including Los Angeles Drug Co. v. Superior Court, 8 Cal. 2d 71, 72 (Cal. 1936); Hill v. Superior Court, 16 Cal. 2d 527, 531 (1940); and Oil Well Core Drilling Co. v. Barnhart, 20 Cal. App. 2d 677, 680 (1937).

Plaintiffs' claims are tort claims and will not support a writ of attachment.

### C. Probable Validity of Plaintiffs' Claims

The "probably validity" requirement is evaluated under the preponderance of the evidence standard. Blastrac, N.A. v. Concrete Solutions & Supply, 678 F. Supp. 2d 1001, 1005 (C.D. Cal. 2010) ("[T]the plaintiff must show it is more likely than not that it will obtain a judgment against the defendant.") (citing Loeb & Loeb, 166 Cal. App. 3d 1110, 1120 (Cal. Ct. App. 1985) ("In determining the probable validity of a claim where the defendant makes an appearance, the court must consider the relative merits of the positions of the respective parties and make a determination of the probable outcome of the litigation.")).

Here, Plaintiffs have failed to establish the probable validity of their claims arising out of

15

1  the alleged theft of personal property and the theft and misappropriation of trade secrets. Plaintiffs
2  have not submitted any evidence establishing that a theft occurred or that it was Defendants who
3  perpetrated it. Indeed, the full extent of Plaintiffs' evidence pointing to Defendants is the fact that
4  Defendants had keys to the corporate facility from which Plaintiffs' cash and property were
5  allegedly taken. And Plaintiffs admit that others had keys as well. Moreover, the amount stolen is
6  not a fixed amount, nor is it readily ascertainable, because Plaintiffs have submitted no evidence
7  establishing either the fact that the property was stolen or the value of the property. On the record
8  before the Court, a writ of attachment on the theft claims cannot issue.

9        With respect to Plaintiffs' infringement claims, discussed more fully above, Plaintiffs
10  submitted a summary of the revenue allegedly misappropriated by Novus Opti-Lab, including the
11  names of the customers who allegedly paid Novus Opti-Lab thinking they were paying Novus
12  Optimum, and the amounts they paid. Defendants do not contest that Novus Opti-Lab received
13  $14,683.40 in revenue from Novus Optimum customers. And, for the reasons discussed above
14  with respect to Plaintiffs' Motion for Preliminary Injunction, Plaintiffs have established the
15  probable validity of their trademark and copyright claims. Thus, Plaintiffs satisfy the probable
16  validity requirement for an attachment to issue. However, as discussed above, the California
17  Attachment Law does not authorize prejudgment attachment for trademark and copyright claims,
18  and even if it did, Plaintiffs have not waived their tort claims and opted to sue in assumpsit.

19      **D.**     **Financial Elder Abuse Law**

20        Plaintiffs argue that they are also entitled to a writ of attachment pursuant to California
21  Welfare and Institutions Code Section 15657.01, which provides: "Notwithstanding Section
22  483.010 of the Code of Civil Procedure ("C.C.P."), an attachment may be issued in any action for
23  damages pursuant to Section 15657.5 for financial abuse of an elder or dependent adult, as defined
24  in Section 15610.30. The other provisions of the Code of Civil Procedure not inconsistent with
25  this article shall govern the issuance of an attachment pursuant to this section."

26        Section 483.010(a) of the C.C.P. provides, "Except as otherwise provided by statute, an
27  attachment may be issued only in an action on a claim or claims for money, each of which is based
28

1 upon a contract, express or implied, where the total amount of the claim or claims is a fixed or
2 readily ascertainable amount not less than five hundred dollars ($500) exclusive of costs, interest,
3 and attorney's fees." Thus, although no court has yet construed section 15657.01, it would appear
4 to relieve Plaintiffs of proving that their claim is founded on contract. This interpretation is
5 consistent with the legislative history of the statute. See Legislative Counsel's Digest, S.B. 611,
6 2007 Cal. Legis. Serv. Ch. 45 ("Under the Attachment Law, a plaintiff is authorized to use the
7 remedy of attachment against a defendant's property to secure the amount of the claimed
8 indebtedness to the plaintiff in connection with cases involving contracts. ¶ This bill would also
9 permit the use of the Attachment Law in cases involving financial abuse against an elder or
10 dependent adult, whether or not other forms of relief are demanded.").

11 However, the remainder of the attachment law's requirements still apply, and Plaintiffs
12 have not established the probable validity of their theft of personal property claims, nor are those
13 claims for a fixed quantity that is readily ascertainable. The only fixed amount as to which
14 Plaintiffs have established the probably validity of their claims is the $14,683.40 that Defendants
15 received through their use of the Novus Opti-Lab website. Those funds, however, (if they do not
16 belong to Defendants) belong to Novus Optimum Labs, a Nevada Corporation, and not to
17 individual plaintiff Meliza Reyes. ECF No. 1, Compl., ¶ 5. The corporation does not have
18 standing to bring an elder abuse claim, and so section 15657.01 does not apply.

19 For the foregoing reasons, the Court DENIES Plaintiffs' Application for a Writ of
20 Attachment.

**V. CONCLUSION**

Plaintiffs' Motion for a Preliminary Injunction is GRANTED as follows:

1. Defendants Gina Tamayo, Edgardo Tamayo, Novus Opti-Lab, and all their officers, agents, servants, and employees are immediately RESTRAINED and ENJOINED from:

    a. Use of the Novus Opti-Lab Domain Name (novusopti-lab.webs.com);

    b. Use of the Novus Opti-Lab credit card terminal;

      c.    Use of the Novus Opti-Lab dba, registered in the County of San Mateo, California;

      d.    Use of the Novus Optimum or Novus Opti-Lab company or product marks;

      e.    Distributing, selling, or offering for sale, product bearing the Novus Optimum or Novus Opti-Lab marks;

      f.    Doing any other act that is likely to confuse, mislead, or deceive anyone into believing that Defendants are associated with Plaintiff Reyes or Plaintiff Novus Optimum;

      g.    Using, destroying, disposing of, disclosing, copying, or transmitting any of Plaintiffs' trade secrets, including product formulas and business information;

      h.    Using, destroying, selling, or disposing of Novus Optimum Labs' property;

      i.    Destroying, discarding, or altering any documentary, computer, or other evidence relevant to this litigation;

      j.    Using, disclosing, copying, or transmitting any personal information of any customer of Novus Optimum or Meliza Reyes. The term "personal information" includes, without limitation, names, initials, social security numbers, driver's license numbers, California Identification Card numbers, account numbers, credit or debit card numbers, information that would permit access to an individual's financial accounts, medical information, and health insurance information; and

      k.    Coming within 100 yards of the Novus Optimum Pier 26 facility.

2.    Plaintiffs are ordered to post a bond in the amount of $10,000 within fourteen days of the date of this Order, or any other date set by the Court upon application by Plaintiffs for an extension and a showing of good cause. This Order granting preliminary injunctive relief to Plaintiffs shall only become effective upon the posting of the bond as set forth above within the time limit set by the Court.

1 Failure to do so, absent a court-ordered extension, may result in the withdrawal of
2 this Order and the denial of Plaintiffs' Motion.
3 3. Within 21 days of the date Plaintiffs post the bond described above, each
4 Defendant shall file a sworn affidavit detailing the manner in which that Defendant
5 has complied with this Order.

Plaintiffs' Application for a Writ of Attachment is DENIED.

**IT IS SO ORDERED**.

Dated: July 1, 2013

_____
JON S. TIGAR
United States District Judge

19